## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

ESLEY D. CORNELIUS, III,

        Plaintiff,

v.

CHARLES WELGE,
JESSIE THOMPSON, and
WILLIAM LANNOM,

        Defendants.

Case No. 3:23-CV-01165-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Easley D. Cornelius III brings this civil rights action pursuant to 42 U.S.C. § 1983 against three Marion City police officers, Charles Welge, Jessie Thompson, and William Lannom. Easley alleges that Defendants violated his constitutional rights in connection with a traffic stop, search and arrest. After a preliminary merits review, the Court allowed Cornelius to advance three claims: a Fourth Amendment claim for unlawful stop, search, and seizure (Count I), a Fourteenth Amendment equal protection claim based on racial profiling (Count II), and a claim of false arrest and imprisonment under Illinois law. (Doc. 16). Defendants filed a motion for summary judgment as to all three claims, which Cornelius opposed. (Docs. 70, 81). This motion is fully briefed and ripe for disposition.

### BACKGROUND

On May 8, 2021, Cornelius was driving a green Honda on West Copeland Street in

Marion, Illinois. (Defendants' Statement of Material Facts ¶ 4 (Doc. 70) (hereinafter "Def. SOF"); Plaintiff's Statement of Material Facts ¶ 1 (Doc. 81) (hereinafter "Pl. SOF")). A woman named Ashley Turner was riding in the passenger seat of Cornelius's car. (Def. SOF ¶ 5). At around 1:03 p.m., Defendant Officer Charles Welge was on patrol on West Copeland Street traveling behind Cornelius's Honda. (Def. SOF ¶ 4).

At some point, Cornelius made a right turn onto 2nd Street. (*Id.* ¶ 6). The parties dispute whether Cornelius used his turn signal before doing so. Welge submitted an affidavit in support of Defendants' motion for summary judgment, which states that he "observed the green Honda make a right-hand turn onto 2nd Street without activating its right turn signal at any time prior to making the turn." (Welge Decl. ¶ 3 (Doc. 70, p. 28)). Turner testified consistently with Welge's observation that Cornelius did not activate his blinker before making the turn. (Turner Depo. (Doc, 70, p. 176)). Cornelius remembers things differently. He testified that "[b]efore I got to the stop sign, I put my right blinker, turn blinker on. I put my right blinker on when I came, like within 10, 20 – within when I supposed to do, I put my blinker on. Once I seen the stop sign coming up, I made sure I put my blinker on. Stop, look both ways, made my right turn." (Cornelius Depo. (Doc. 70, p. 61)). Cornelius also testified that he was "driving with two hands on the wheel like an old man, like I was scared for my life" because he knew he was being followed by police. (*Id.*, p. 60).

Soon after Cornelius turned onto 2nd Street, Welge pulled him over for turning without using his blinker. (Def. SOF ¶¶ 7, 8). Welge approached the car and asked for Cornelius's license. (*Id.* ¶ 10). Although it is unclear whether Cornelius produced his

license, there is no dispute that Cornelius's license was revoked at the time. (Cornelius Depo., (Doc. 70, p. 55)); (Welge Decl. ¶ 8). At some point after Welge initiated the stop, Lannom and Thompson arrived on the scene. (Def. SOF ¶ 12).

Welge placed Cornelius in handcuffs, performed a pat-down search, and found $1,540 in cash on him. (Pl. SOF ¶¶ 3-5); (Def. SOF ¶¶ 13, 14). Cornelius testified that at this point, Welge called him a "drug dealing n****r" and told him that he knew Cornelius had drugs in the car. (Cornelius Depo. (Doc. 70, p. 66)). Cornelius also testified that Welge said, "we're tired of you guys coming to our town selling drugs."[1] (Id.). Soon after finding the $1,540, Welge placed Cornelius under arrest for driving on a revoked license and placed him in the back of his squad car. (Def. SOF ¶ 15; Cornelius Depo. (Doc. 70, p. 66)).

Because the Honda had to be towed from the scene, Welge asked Turner to step out of the car so that he could perform a search and inventory of its contents. (Def. SOF ¶ 16). Turner acted nervously and responded "no" when Welge asked her whether she was carrying drugs. (Id. ¶¶ 17, 18). Welge then called for a female officer to come to the scene to perform a pat-down search of Turner. (Id. ¶ 19). At this point, Turner told Welge that Cornelius had handed her a black cloth containing drugs as they were being pulled over. (Id. ¶¶ 20, 21). Turner pulled the black cloth, which contained two white bags holding a clear crystalline substance and a clear bag holding a brown substance, from her pants and told Welge, Thompson, and Lannom that Cornelius had instructed her to hide it there. (Id. ¶¶ 23, 24). Welge conducted a field test of these substances and determined

---

[1] Cornelius also alleges in his brief that Lannom called him "monkey boy" but he cites no evidentiary support in the record for this claim. (Doc. 81, p. 35).

that they contained methamphetamine and heroin. (*Id.* ¶ 26). Cornelius also testified that he heard Lannom tell Turner: "why is you with this guy? You need to stay away from crap like him." (Cornelius Depo. (Doc. 70, p. 68)).

Welge and Lannom conducted an inventory and search of the car and found 4.85 grams of cannabis. (Welge Decl. ¶ 19; Cornelius Depo. (Doc. 70, p. 68)). The search also revealed two digital scales and $3,691 in cash hanging out of Cornelius's wallet, which he had left in the car. (Def. SOF ¶¶ 29, 30). Shortly thereafter, the Honda was towed from the scene. (*Id.* ¶ 32). Turner was released without a citation. (*Id.* ¶ 33).

Cornelius was cited for possession of methamphetamine, heroin, and cannabis, and booked into the Williamson County Jail. (*Id.* ¶¶ 34, 35). Welge seized the combined $5,231, which he had found on Cornelius's person and in his car and issued him a "Notice of Seizure for Forfeiture" (the "Forfeiture Notice"). (*Id.* ¶ 36). The Forfeiture Notice informed Cornelius that a preliminary review would be conducted on May 19, 2021, in the Williamson County Circuit Court. (*Id.*). Cornelius unsuccessfully contested the forfeiture action. (*Id.* ¶¶ 38-42).

The criminal charges against Cornelius that arose out of his arrest were ostensibly nolle prossed. (Cornelius Decl. (Doc. 81, p. 63).

## LEGAL STANDARD

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Assertions that a fact cannot be or is genuinely disputed must be supported by materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. FED. R. CIV. P. 56(c)(1). Once the moving party sets forth the basis for summary judgment, the burden shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (citation modified). This also means that the Court must "resolv[e] conflicts in the evidence in [the nonmovant's] favor." *Spaine v. Cmty. Conts., Inc.*, 756 F.3d 542, 544 (7th Cir. 2014). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

**DISCUSSION**

I.   <u>Defendant Officer Jessie Thompson</u>

The Court begins its examination of the record by noting the lack of evidence implicating Thompson. Defendants statement of material facts explains that Thompson "arrived on the scene at some point after the initial traffic stop." (Def. SOF ¶ 12). That is the extent of his involvement in the events underlying Cornelius's claims, according to Defendants. Cornelius, for his part, states in his statement of material facts that "Thompson also don't remember being on scene but according to statement of facts and ex. 1 incident report he was." (Pl. SOF ¶ 9). At best, the record reveals Thompson's

presence at the scene. But Cornelius points to no evidence suggesting Thompson's participation in conduct that violated his rights under federal or state law. Accordingly, Thompson is entitled to summary judgment on all three claims. *See Pearson v. Hawthorne*, No. 20-cv-309, 2021 WL 806597, at *2 (S.D. Ill. Mar. 3, 2021).

II.    Fourth Amendment Unlawful Stop, Search, and Seizure

Defendants contend that they are entitled to summary judgment on Cornelius's Fourth Amendment claim for two independent reasons: (1) they had probable cause to stop and search Cornelius, and (2) even if they did not have probable cause, they are entitled to qualified immunity. The Court will address each of these arguments in turn.

*a.  Probable Cause*

The Fourth Amendment to the U.S. Constitution protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "This protection extends to everyday traffic stops, which are 'seizures' under the Fourth Amendment." *Tapley v. Chambers*, 840 F.3d 370, 376 (7th Cir. 2016). But a traffic stop is reasonable under the Fourth Amendment—and therefore permitted—when "'the police have probable cause to believe that a traffic violation has occurred.'" *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). Probable cause thus "renders both traffic stops and resulting warrantless arrests permissible" under the Fourth Amendment. *Jones v. City of Elkhart*, 737 F.3d 1107, 1114 (7th Cir. 2013). To succeed on his claim of an unlawful stop, search, and seizure, Cornelius must show that Defendants' actions were "*un*reasonable—that is, that [they] had no probable cause to stop and arrest him." *Tapley*, 840 F.3d at 376 (emphasis in original).

Here, Defendants progressively escalated their intrusion into Cornelius's privacy over the course of their encounter with him. What began as a traffic stop evolved into a pat-down search, and then morphed into a full-blown search and inventory of Cornelius's car. Each of these investigatory steps must be justified by the requisite level of suspicion or cause. *United States v. Williams*, 731 F.3d 678, 685-87 (7th Cir. 2013). "A probable-cause determination is based on the facts as they stand at the time the decision is made. Facts later discovered cannot support probable cause; nor can they detract from it." *United States v. Hansmeier*, 867 F.3d 807, 811 n.1 (7th Cir. 2017); *accord Carmichael v. Village of Palatine*, 605 F.3d 451, 457-58 (7th Cir. 2010). "Law enforcement cannot rely on information gathered after the fact and back-build a case for probable cause." *United States v. Garcia*, 644 F. Supp. 3d 474, 482 (N.D. Ind. 2022). This means that the probable cause inquiry here must focus, first, on the state of the evidence that existed when Welge decided to pull Cornelius over.

Cornelius was stopped after he made a right turn onto 2nd Street because Welge believed he had done so without using his blinker. In Illinois, it is unlawful to "turn a vehicle from a direct course" without using a blinker. *See* 625 ILCS 5/11-804(b). Thus, if Welge reasonably believed that Cornelius violated section 5/11-804(b), the stop would have been permissible under the Fourth Amendment. *See United States v. Garcia–Garcia*, 633 F.3d 608, 612 (7th Cir. 2011) ("When a police officer reasonably believes that a driver has committed even a minor traffic offense, probable cause supports the stop."). But if the evidence could support a finding that Cornelius *did* use his blinker, then probable cause for the stop would be lacking and any developments that happened after the fact—

including the discovery of cash, methamphetamine, heroin, and cannabis—cannot be used to support it. And if probable cause was lacking at the outset—or if there is a genuine issue of material fact as to whether probable cause existed—then summary must be denied as to Count I. *See United States v. Cotton*, 420 F. Supp. 3d 777, 778 (N.D. Ill. 2019) (holding that "[b]ecause there was no probable cause or reasonable suspicion to justify the initial stop, the subsequent search was unlawful, and consequently, the Court must suppress the fruit of the search.").

Here, the evidence is equivocal as to whether Cornelius used his blinker before turning onto 2nd Street. Welge "observed the green Honda make a right-hand turn onto 2nd Street without activating its right turn signal at any time prior to making the turn." Turner agreed with Welge and testified that Cornelius did not use his blinker before making the turn. But Cornelius has a different take on what happened. He testified that "[b]efore I got to the stop sign, I put my right blinker, turn blinker on. I put my right blinker on when I came, like within 10, 20 – within when I supposed to do, I put my blinker on. Once I seen the stop sign coming up, I made sure I put my blinker on. Stop, look both ways, made my right turn." He also testified that he was "driving with two hands on the wheel like an old man, like I was scared for my life" because he knew he was being followed by police.

Cornelius's testimony permits a reasonable inference that he was driving cautiously and following the rules of the road when Welge pulled him over. It is not this Court's job to assess the credibility of his (or Welge's) testimony. What matters is that a jury may believe that Cornelius turned his blinker on "before" he reached the stop sign

and that he did so "when [he] [was] supposed to." If they make this determination, they very well may also find that Welge lacked probable cause to stop Cornelius. In *Tapley*, the Seventh Circuit affirmed summary judgment on a similar Fourth Amendment claim that arose out of a traffic stop because the plaintiff failed to produce evidence that refuted the officer's claim that he had been speeding. *Tapley*, 840 F.3d at 377. "To survive summary judgment," the court explained, "Tapley should have denied that he was speeding through deposition testimony, an affidavit, or some other means." *Id.* "[H]is failure to make this denial constitute[d] a failure to deny the existence of probable cause." *Id.* Here, however, Cornelius has come forward with competent evidence (in the form of his deposition testimony) that he used his blinker before turning onto 2nd Street. This refutes Welge's claim that he did not do so, and it creates a genuine issue of material fact as to the existence of probable cause.[2] *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("Where the parties present two vastly different stories—as they do here—it is almost certain that there are genuine issues of material fact in dispute.").

Judge Dugan's decision in *Pearson v. Hawthorne*, 2021 WL 806597, is particularly instructive. In that case, the defendant (a police officer) initiated a traffic stop after he witnessed the plaintiff changing lanes without using his blinker. *Id.* at *1. After the plaintiff refused to provide his identification, the defendant arrested him and conducted an inventory search of his car where he found a loaded gun. *Id.* The plaintiff was then

---

[2] Defendants do not appear to dispute that the question of whether Cornelius used his blinker is disputed. (Def. Response to Pl. SOF ¶ 2 (Doc. 86): "It is disputed that Plaintiff used his turn signal prior to making the turn.").

cited for failure to use a turn signal, obstructing a police officer, a concealed carry violation, and operating an uninsured motor vehicle—all violations of Illinois law. *Id.* At summary judgment, the plaintiff submitted an affidavit which stated that he "used a turn signal to change lanes . . . at the date, time, and location referenced in Defendants' memorandum in support of their summary judgment motion where Officer Alex Hawthorne states that I did not use a turn signal." *Id.* (alterations omitted). Judge Dugan found that there was "a dispute as to whether Plaintiff used his turn signal before switching lanes to move into the lane to merge onto Interstate 270." *Id.* at *2. This, in turn, meant that summary judgment was precluded because "the dispute about turn signal use raises a genuine dispute of material fact as to whether Hawthorne had probable cause to make the stop." *Id.* at *3.

The facts of this case are in near perfect alignment with *Pearson*. When an officer initiates a traffic stop because a driver failed to use his turn signal, the driver's insistence that he *did* use his turn signal creates a genuine issue of material fact. *See id.* (denying summary judgment based on "reasonable inference that, if [the driver] used his turn signal as he claims, Hawthorne could not have witnessed a traffic violation.").

At this point, it makes sense to address a discovery dispute that demanded a considerable amount of the parties' and the Court's time in this case. It is undisputed that Defendants did not produce Welge's squad car's dash cam recordings in discovery. Cornelius, believing that these recordings would validate his story, filed numerous motions to obtain them and argued that Defendants are at fault for their "spoliation." (Docs. 36, 53, 58, 82). The Court ordered Defendants to show cause as to the whereabouts

of Welge's dash cam footage, if any. (Docs. 75). Defendants explained that the Marion Police Department maintained all dash cam footage for a period of two years pursuant to a retention schedule. (Doc. 80 ¶ 14). Any arrest footage needed in connection with litigation or other matters would be downloaded from a server to a local downloads folder and burned onto a CD. (*Id.* ¶ 17). A forensic analysis did not reveal a download history for the dash cam footage of Welge's stop and arrest of Cornelius on May 8, 2021. (*Id.* ¶ 29). And because Defendants did not receive notice of this action until January 2024, when they were served, any dash cam footage that would have existed of Cornelius's arrest would have been deleted on May 8, 2023, pursuant to the department's two-year retention schedule. (*Id.* ¶ 31).

The Court offers this brief recitation of the dispute concerning the dash cam recordings because, if such evidence existed, it would make the probable cause inquiry much simpler.[3] "When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016). Thus, if video footage of Welge's interactions with Cornelius existed, including the stop on 2nd Street, it would likely clear up the very dispute at the heart of this case: whether Cornelius used his blinker or not. And if Welge could point to such evidence to corroborate his observations, the Court would indeed be inclined to credit his version of events over Cornelius's as the Seventh Circuit instructed in *Williams*. But because no such

---

[3] In their reply brief, Defendants disputed that the stop was not recorded. (Def. Response to Pl. SOF ¶ 2).

video exists (or no longer exists), Welge's and Cornelius's testimony offers a straightforward factual conflict about the existence of probable cause that must be resolved by a jury.

Accordingly, summary judgment must be denied as to the issue of probable cause in Count I.

### b. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Whether qualified immunity applies turns on two questions: first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (citing *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)). If the answer to either question is no, Defendants are entitled to qualified immunity. *Id.*

Defendants contend that even if Welge did not have probable cause to stop Cornelius, they are shielded by qualified immunity because, at a minimum, Welge had "arguable probable cause" to initiate the stop. Arguable probable cause "protects officers who reasonably but mistakenly believe that probable cause exists." *Abbott v. Sangamon County*, 705 F.3d 706, 714-15 (7th Cir. 2013). "Though at first blush similar, the arguable-probable-cause inquiry is separate from the probable-cause inquiry, whereas an arrest

not supported by probable cause is a constitutional violation, an arrest not supported by arguable probable cause is a violation of a 'clearly established' constitutional right." *Id.* at 715 (internal citation omitted).

Defendants' argument is unpersuasive for two reasons. First, it rests on disputed facts. It requires the Court to view the evidence in the light most favorable to them and thus determine that Cornelius made the turn onto 2nd Street without using his blinker. This interpretation, even in the context of a qualified immunity dispute, is impermissible because the Court is bound to view the record in the light most favorable to Cornelius. *Smith*, 10 F.4th at 737. This inquiry led the Court to conclude that there is a genuine issue of fact as to whether Cornelius used his blinker. If he did, then Welge acted without probable cause in stopping him, which, in turn, would amount to a constitutional violation under the first prong of the qualified immunity inquiry. Second, there can be no serious debate that the Fourth Amendment's probable cause requirement "extends to everyday traffic stops" and that this right was clearly established when Welge stopped Cornelius. *Tapley*, 840 F.3d at 376; *see also D.Z. v. Buell*, 796 F.3d 749, 753 (7th Cir. 2015) (no dispute that right to be free from unreasonable seizures was clearly established in 2012).

A determination on summary judgment that probable cause may have been lacking "amount[s] to a rejection of [the] qualified immunity defense." *Levan v. George*, 604 F.3d 366, 369 (7th Cir. 2010). This result flows logically from the Court's examination of the record regarding the existence of probable cause for the traffic stop. Accordingly, summary judgment must be denied as to Defendants' entitlement to qualified immunity.

Page 13 of 20

*See Hernandez v. City of Peoria*, No. 19 CV 01153, 2022 WL 22624877, at *8 (C.D. Ill. Aug. 5, 2022) (denying summary judgment on qualified immunity grounds because facts viewed in light most favorable to plaintiff suggested violation of clearly established constitutional right).

For these reasons, the Court denies summary judgment on Count I.

III.   Fourteenth Amendment Equal Protection Claim

In Count II, Cornelius advances an equal protection claim under the Fourteenth Amendment based on race. Cornelius is a Black man, and he argues that Welge decided to stop him and later searched his car and arrested him because of his race. This all happened even though Turner, a white woman, was found to be in possession of methamphetamine and heroin yet was released without a citation. Here too, Defendants contest the viability of Cornelius's claim on the merits and on qualified immunity grounds.

*a. Merits*

"The Equal Protection Clause prohibits intentional racial discrimination by state and local officials, and a person who is subjected to such discrimination may seek relief under 42 U.S.C. § 1983." *Taylor v. Ways*, 999 F.3d 478, 487 (7th Cir. 2021). To succeed on his equal protection claim, Cornelius must show that Defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose. *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017); *Chavez v Ill. State Police*, 251 F.3d 635-36 (7th Cir. 2001). To prove a discriminatory effect, he must show that "he was a member of a protected class and that he was treated differently from a similarly situated member of

an unprotected class." *Alston*, 853 F.3d at 906. "He may do so either by statistical analysis or by identifying a particular similarly situated member of the unprotected class who was treated differently from him." *Id.*

The evidence of a discriminatory effect is apparent here. Defendants encountered two people in Cornelius's car: a Black man and a white woman. Turner was found to be holding methamphetamine and heroin in a black cloth in her pants. Although she said Cornelius directed her to hide the drugs in her pants, the record is clear that she, not Cornelius, was holding those drugs when she encountered police. Defendants apparently believed Turner's statement that she was only doing what Cornelius told her to do because they released her without issuing her a citation for the drugs. Cornelius, on the other hand, was cited for possession of the methamphetamine and heroin that Turner was carrying and for the cannabis in his car. Although Cornelius admitted that the cannabis belonged to him, he denied that the methamphetamine and heroin were his. Thus, the record establishes a discriminatory effect, at least with respect to the methamphetamine and the heroin: a white person who was carrying drugs being released without a citation, and a Black person being cited for possession of the drugs that the white person was carrying. *See id.* at 907 (evidence of discriminatory effect may be offered by comparing "similarly situated people" of "different classes").

The second element of Cornelius's equal protection claim concerns the *purpose* behind Defendants' actions. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). A discriminatory purpose requires

Page 15 of 20

evidence that Defendants acted "at least in part 'because of' its adverse effects upon an identifiable group." *Chavez*, 251 F.3d at 645 (citation modified). This element is satisfied based on Cornelius's deposition testimony wherein he accuses Welge of calling him a "drug dealing n****r." The racial intent behind this statement is readily apparent—as it is for Welge's subsequent statement that he knew he would find drugs in Cornelius's car and that he was "tired of you guys coming to our town selling drugs." The same goes for Lannom's statement to Turner asking her: "why is you with this guy? You need to stay away from crap like him." Lannom's statement could be interpreted as racially motivated under the circumstances because it was offered by a white police officer to a white woman about the Black man she was with. *See DeWalt v. Carter*, 224 F.3d 607, 612 n.3 (7th Cir. 2000) ("use of racially derogatory language . . . is strong evidence of racial animus, an essential element of any equal protection claim."), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 409, 426 (7th Cir. 2020); *Nance v. City of Elgin*, No. 06 CV 6608, 2009 WL 3677819, at *3 (N.D. Ill. Nov. 2, 2009) (reference to predominantly Black clientele of jazz club as "those people" was evidence of discriminatory intent).

Welge's use of a racial slur and other demeaning language permits a reasonable inference of discriminatory purpose because it suggests that Defendants subjected Cornelius to an invasive search at least in part because of his race. Under a faithful application of Rule 56, such evidence is enough to defeat summary judgment on Count II. *See Taylor*, 999 F.3d at 489 ("'Unmistakable evidence of racial animus,' such as a defendant's use of racial epithets or slurs, makes for a 'simple analysis'" in an equal protection claim) (quoting *LaRiviere v. Bd. of Tr. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th

Page 16 of 20

Cir. 2019)); *cf. Village of Arlington Heights*, 429 U.S. at 265 (plaintiff not required to "prove that the challenged action rested *solely* on racially discriminatory purposes.") (emphasis added).

Defendants' reliance on *Sides v. City of Champaign*, 496 F.3d 820 (7th Cir. 2007), is unpersuasive. There, police received a report of a man masturbating in a car while a woman was in the car with him. *Id.* at 823. The police cited the man but not the woman for public indecency. *Id.* The man later brought a civil rights action against various defendants and raised an equal protection claim based on sex. *Id.* at 827. The Seventh Circuit rejected this claim because the woman had shown herself remorseful and cooperative when police confronted her, whereas the man failed to provide a "straight answer" and was uncooperative. *Id.* It was well within the police's and prosecutors' discretion, the court explained, to "reward[] cooperation with leniency." *Id.* But the woman in *Sides* was not similarly situated to the man. The man was the one engaging in lewd behavior whereas the woman was not—at least not to the same degree. It was not unreasonable for the police to focus their inquiry on the man based on the report they had received.

This case presents the factual inverse of *Sides*. Turner was the one carrying the drugs, not Cornelius, yet Cornelius was the one cited for drug possession. Thus, the record demonstrates sufficient evidence of a racially discriminatory effect and intent to sustain Cornelius's equal protection claim.

### b. *Qualified Immunity*

Defendants also claim they are entitled to qualified immunity on Count II. This

argument is advanced in a somewhat perfunctory manner without citations to any relevant legal authority. Defendants contend that Welge was not aware that Cornelius was Black when he pulled him over and that "there is no precedent that clearly establishes that Defendants' conduct was unconstitutional under the circumstances." (Def. Br., p. 24 (Doc. 70)).

But Cornelius's equal protection claim is not limited to the moment when Welge initiated the traffic stop. It covers his entire encounter with Defendants. And viewed through this lens, the record demonstrates disputed issues of material fact as to whether Defendants subjected Cornelius to harsher and more invasive treatment because of his race. Again, crediting Cornelius's deposition testimony as the Court must, there can be no serious debate that Welge calling him a "drug dealing n****r" suggests racially-motivated conduct. *See Taylor*, 999 F.3d at 490 ("The word 'n****r,' used by Ernst, a white man, aimed at Taylor on several separate occasions, reflects a uniquely virulent strain of racism, long recognized by the federal courts as capable of having a highly disturbing impact on the listener.") (quotation marks omitted). There is also no debate that police are prohibited from stopping and searching individuals on the basis of race, and that this right was clearly established when Cornelius was stopped and searched by Defendants. *See Whren*, 517 U.S. at 813 (holding that "the Constitution prohibits selective enforcement of the law based on considerations such as race."). It follows, then, that summary judgment is improper as to Count II on the basis of qualified immunity.

And for these reasons, the Court denies summary judgment on Count II.

IV.     False Arrest and Imprisonment under Illinois Law

In Count III, Cornelius asserts a claim of false arrest and imprisonment under Illinois law. Defendants argue that summary judgment is appropriate on this claim for the same reason it was appropriate as to Count I: the existence of probable cause.

"The *lack* of probable cause is . . . an element of an Illinois false arrest claim." *Murawski v. Reid*, 375 F. Supp. 3d 998, 1006 (N.D. Ill. 2019) (emphasis added). "Essentially, a plaintiff has to show that she was unreasonably restrained without probable cause." *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 317 (Ill. App. Ct. 2006). "The standard for evaluating probable cause is the same under Illinois and federal law." *Murawski*, 375 F. Supp. 3d at 1006 (citing *Gauger v. Hendle*, 954 N.E.2d 307, 329 (Ill. 2011)).

If Defendants were correct that there is no genuine issue of material fact as to the existence of probable cause, then they would indeed be entitled to summary judgment on Count III. But the Court has already found that a genuine issue of material fact exists as to whether Welge had probable cause to stop Cornelius because the evidence is in conflict as to whether Cornelius used his blinker as required by 625 ILCS 5/11-804(b). If a jury believes Cornelius's testimony that he used his blinker when turning onto 2nd Street, then Welge's probable cause justification is kaput.

As noted, the Court is not in the business of making credibility determinations at this stage. All that matters is that there is competent evidence on the question of whether Cornelius used his blinker. And because the evidence on this critical question is in conflict, summary judgment is not appropriate as to Count III. *Cf. Stokes v. Bd. of Educ. of Chicago*, 599 F.3d 617, 626 (7th Cir. 2010) (existence of probable cause dispositive of Illinois

Page 19 of 20

false arrest claim).

Accordingly, summary judgment is not appropriate on Count III.

### CONCLUSION

For these reasons, the motion for summary judgment filed by Defendants (Doc. 70) is **GRANTED in part** and **DENIED in part**. All claims asserted against Defendant Officer Jessie Thompson are **DISMISSED with prejudice**. Counts I, II, and III will advance to trial against Defendants Officers Charles Welge and William Lannom.

A status conference will be set by separate order to discuss a potential referral of this case to mediation and selection of a firm trial date.

**IT IS SO ORDERED.**

**DATED:  March 27, 2026**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**